Mr. Lender, please proceed. May it please the Court, David Lender for the appellants including Dow AgroSciences or DAS. There are several issues raised in the briefing that we believe warrants vacater of the arbitration award, but I'm going to spend my limited time this morning focusing on three core issues. First is that because the reissued patent that is the basis for 97% of the award was not included in the terms of reference, the agreement that expressly delimits and defines the scope of the arbitration, the arbitrators exceeded the scope of their authority by providing any relief based on that patent. Second is that enforcement of the award violates U.S. patent policy by extending bears monopoly on the Pat gene for 30 years in violation of the double patenting doctrine and awarding $138 million in damages for seven years past the expiration of the reissue patent. And third, that the award of $130 million in pre- and post-judgment interest manifestly disregards Indiana law and violates federal law on post-judgment interest. Of that interest, how much, I guess, $33 million so far has run on that, Your Honor. Okay. So it's about $100 million of pre-judgment, $30 million of the post-judgment. Just small, relatively speaking. I guess, depending on your perspective. Let me start with the first issue, which is the terms of reference. The arbitrator's power to decide comes from the terms of reference. This is the argument, this is the agreement negotiated and signed by the parties that defines the scope of the New York Convention when it is based on a matter not falling within the terms of submission to the arbitrators. And this is an issue that falls squarely within the province of the court to decide. As the restatement of U.S. law of international commercial arbitration makes clear, the court has the authority to determine de novo whether a convention award deals with matters that were not You can see how specific the terms of reference actually are. And nowhere will you see any mention of the reissue patent. Bayer easily could have included the reissue in the terms of reference if it wanted it included in this arbitration. By the time the terms of reference were finalized in October of 2013, Bayer had already filed its reissue application and was telling the Patent Office that was invalid based on myriad. Yet they only included the 665 patent and then actually sought a preliminary injunction on this admittedly invalid patent. Bayer never told DAS or the tribunal that it was seeking a reissue, which prevented us from filing a protest in the reissue application. And Bayer also never told the Patent Office that it owned the expired Strauch patents or that it was also covered patent. Only by omitting these critical facts could they get their reissue patent. And in fact now that the Patent Office knows these facts based on DAO's re-exams, the PTO has entered final office actions rejecting the reissue patent on double patent grounds. Now although Article 5 of the Convention does not require a showing of prejudice to vacate, DAS clearly was prejudiced by this late addition of the reissue patent into the arbitration. It's analogous to essentially adding a new patent right in the middle of a trial. It's narrower than the 665, right? It is narrower than the 665, yes. Okay, but it's essentially the same subject matter, just a narrower version. Yeah, the main difference is the invalidity questions would be different, right? I mean, in other words, I get on the infringement it would be very similar, but on invalidity we were dealing with a 665 patent that clearly was invalid based on myriad. That's why they went to the Patent Office to be very different. There also is the issue, Judge Chen, that the reissue gets added to the arbitration in the middle of Phase 2. So we've already done a trial on Phase 1, we're now in the middle of Phase 2. Doesn't 23-4 of the agreement allow the arbiters to add new claims expressly? Yes, Judge Moore, the ICC Article 23 does say that the tribunal can, except that what happened here is the way it normally would work is you would then amend, you would move to amend the terms of reference, and then there would be a hearing and we would discuss about what would happen based on that. But here there was no amendment, and in fact, Your Honor, the basis, the basis for the tribunal finding the reissue patent was not Article 23 at all. Could you argue this in your brief, this part about the new claims? Yes, yes, Your Honor. Yes, the terms of reference, that's different from your argument here that you're making about, I think it's like a footnote somewhere. Go ahead. Yeah, the Article 23 point that you raised, that was not the basis by which the tribunal actually added the reissue to the patent. They found, they concluded, instead of Appendix 330, Paragraph 350, that the infringement read was the same, so therefore they could add the same, that it wasn't a new claim. But as the court office knows, the has different invalidity implications, and the tribunal itself found that the reissue was different, but that's why they gave us intervening rights as it pertained to the reissue patent. So here, because the reissue patent, which anchors 97% of the award, should never have been included in this arbitration. I guess if you're right, then what would you have wanted? Would you have wanted a new arbitration to get fired up on the reissue? Yeah, I mean, there would have had to have either been a new arbitration involving the reissue, or at least there should have been a pause in this arbitration to allow us to have discovery, allow us to actually brief the issues. I mean, remember, the perspective here is the 665 is basically in the case for two years, and then there's a complete reversal, and within a matter of weeks, we now have to brief a completely new patent. So either they should have formally moved to amend the terms of reference, and then we could have talked about a new schedule, new discovery, given us a real opportunity, or it should have been arbitrated in a completely different arbitration. It's just because of the fact that the terms of reference is the contract that gives the arbitrators the authority to decide things, and the reissue wasn't included here. We didn't agree in this one. But I'm just trying to understand your prejudice argument. I mean, what did you lose that you would have gotten back if there was a brand new arbitration installed for the reissue patent? Just to be clear, obviously, Article V doesn't require any prejudice, but with that said, we would have gotten discovery, which we had none of, on the reissue patent. And we would have had the opportunity to pursue different invalidity arguments, because essentially the 665, our position was just like there. You had the obviousness type double patenting. Yes. So what else? Just plain 103 arguments, 102 arguments, anticipation, obviousness. None of that was raised below, because the 665, we believe, was dead on arrival based on myriad. Because myriad came out before the terms of reference were finalized. Let me actually now turn, if I could, and talk about the double patenting issue. I'm sorry, I may have missed something. So did you say to the tribunal, if you're going to add this, we need to be able to submit new invalidity contentions? No, what we did is we objected to the reissue being added to the arbitration. We objected in all of our explaining specifically that new, for example, 103 evidence and arguments were going to be needed. And the condition of any admitting of expansion of the proceeding would be that you would have to be allowed to do these additional things. We argued that the invalidity issues would be different. We argued due process, but we obviously didn't get into it in as much detail as you're saying. There's obviously an efficiency interest if there's no prejudice of wrapping it into the same proceeding. And if you didn't explain the prejudice, then how could we fall under whatever standard or review the tribunal for saying there's no reason not to do this? Okay, two things. One is Article 5. Except delay, which is not really an interest except in, you know, from one side of the proceeding. We raised when we objected that there was violations of due process and the timing was... But a violation of due process requires something concretely prejudicial. Right. Right. So where did you explain to the tribunal, here is what we haven't had a chance to do, and if you include the reissue, we now need a chance to do. Right, but the way this, we raised that there would be different invalidity issues. But what happens here, the way this works is we have the objections, then we get a guidance letter that says you should presume that the reissue will be included, but you don't actually get the actual decision that the reissue is going to be included until you get the award. That was one of the issues that's actually decided in the award that the reissue will now be included in the arbitration. And Article 5, as well, doesn't require prejudice at all. It basically looks at the contract, the terms of reference as written. But yes, we didn't get into like a long exposition of all the different things. We objected, we said why we objected, and then it gets, we don't find out until the very end that the tribunal has actually made the to where you brought to their attention that you would have different validity issues? Yes, I believe, Your Honor, I believe it was raised, just give me one moment. You know what, why don't you tell me I'm rebuttal, and we'll have one of your folks find it for you. Let me now turn and talk about the public policy challenges to the enforcement of the award, which is a grounds for vacant or under Article 5 2B of the Convention. There's no dispute in this case that the prohibition on double patenting is based on public policy. This court has repeatedly said so in cases like Abbey, Hubble, and Gilead. The Patent Office said so in its final office actions, rejecting the reissue patent on double patenting. Do we have some patent flaw that is not based on public policy? Well, I mean, it's a great question. I think the issue of double patenting is different, because it's anchored in the U.S. Constitution. 101, 102, 103, 112, you know, all of those grounds of validity are each grounded in public policy concern, right? Yes. We don't want to give out more patents on the exact same thing, and so if an arbitration tribunal misapplies section 102 and finds the patent is actually valid, then there's the same situation as we have here, an improper extension of the life of a patent that never should have been granted in the first place. Right, but here for double patenting, it is different. I mean, in the sense of what you're basically doing is, and especially look at what happened here, Bayer essentially now gets a 30-year monopoly on patent because of the double patent, and that's why... Yeah, but you could make the same argument with regard to any patent you thought was invalid, and then we'd have to review any of them, because any patent that you were going to say was wrongly decided to be valid is going to be a patent that's not going to just block you, but potentially this decision could affect lots of other companies. They're going to continue to be able to enforce this, and therefore your public policy argument would be very strong for any ground of validity, if I were to accept that as sufficient. Yes, Judge Moore, but the reason why this court has said in Abbey and Hubbell and Gilead that double patenting was different... Because it's confusing and difficult. It's because it's... Painful, right, he said it, just saying it louder. Yeah, because unlike perhaps some of the other invalidity defenses that you are raising, which I appreciate, obviously, if anybody has an invalid patent, there are issues involved, but the reason why this court has created the obviousness of double patenting doctrine is because it's actually anchored entirely in the limited times exception that's set forth in the U.S. I mean, the word invention would seem to have something to do with novelty, which would be anchored in the Constitution as well, or discoveries, or whatever the constitutional word is, I forget. But the limited times exception, the essence of the limited times is the entire essence of the bargain of the Patent Act, and I think it is worth, noteworthy to note that... So you think it's worse under the Constitution to extend a patent than it is to give one that inhibits competition from day one? It's worse to simply inhibit it from day whatever, 17 years is, or 14 years? Well, particularly in the context of this case, I would say yes, because by the time that we were sued, the Strzok patents had already expired, so they had already gotten their retirement off. Were the Strzok patents, is it Straw? I call it Straw, some people call it Strouch, it's an issue of debate. Would those have been 102-103 prior art? No, that's because of the anomaly, because the Lehmans patents were actually filed first but issued second, so as a result, Strouch was not. And the Lehmans and the Strouch originated in different companies, right? And if they had remained in separate hands, then the public in general would have been subject to an exclusivity, right? Why is it worse if they come into a single hands, which at a minimum would reduce the double marginalization problem? Well, the issue here is, again, it's fundamentally that Bayer, because of what happened here, right? Bayer, by essentially putting these patents and owning them in two different subsidiaries... I didn't put it, so there's Bayer NV, which is Hearst, right? No, no, the other one, it's PGS, right? Bayer is the parent, AG, yeah. There's Bayer CropScience AG, which is Hearst, and Bayer CropScience NV, which was PGS, or did I get that? Maybe I got it backwards. But they were originally separate companies, separate assignees. There could well have been a period, what is it, up to 2030? 2023. 2023, that the public was generally subject to an exclusivity, right? Why is it self-evident that double patenting as a matter of public policy suddenly makes that impossible when the two monopoly rights are consolidated in one hands, which does, as an economic matter, potentially have the benefit of reducing the double marginalization problem? Because here, the effect of all this is that Bayer, by now owning both of these patents in wholly owned subsidiaries, is essentially getting a 30-year monopoly on the patent, right? So instead of two companies in succession having... Instead of two companies. Why is one worse than the other? Well, because in the context of this case, I mean, I hear your point, but fundamentally the whole point of double patenting is to say that any individual person, any individual company should not get this extended life, if you will, over an invention that they have, right? We had a license. We took a license from Bayer to this pool of patents. So we did have a license to both of these patents, but for this... But there isn't actually, if I remember right, there's no case that specifically addresses this sister company, separate origin situation. The best you had was a statement in one of the 706 provisions of the MPEP, which is not law, and was not even addressing double patenting, but it was addressing how to apply 103. That's going to rise to the level of the kind of clear fundamental public policy that we would use to upset a international arbitration award? Well, the public policy here that we're trying to protect again are the two public policies that underlie the double patent. But we would be actually making up an extension of existing doctrine for the purpose of reviewing an arbitration award? Well, Your Honor, I guess I'd say two things. One is obviously in Hubble this court said that any extension, the time-wise extension of the right to exclude no matter how it comes about. The phrase time-wise extension is not exactly self-defining. So we would be facing something that according to the small size of the authorities you've invoked would basically be a new pronouncement of a doctrine that is not basically, it is common law. Except, of course, going the other way then would encourage people to have an easy out to subvert the whole policy behind the double patent doctrine because then what companies could just do is take all their— we would be saying it's certainly not. Whatever the answer to the question is, it's not established and clear enough for it to be a ground that meets the extraordinarily high standard for judicial override of arbitration. Well, Your Honor, ultimately the issue, the question for the court is whether the standard, the public policies underlying the double patent doctrine rise to the level of a public policy  as applied to these particular circumstances, which is not within the— is not covered by any existing precedent. It's basically based on the facts as the arbitrate is found, right? You would have to decide whether or not, based on the facts as found, meaning the facts that there's no question that the Lehman's genus patent covers the exact same subject matter as the Strzok patent. There's no question that Bayer now gets a 30-year monopoly on Pat. The court then has to decide— Okay, Mr. Linder, you have used all your time, all your rebuttal time and three and a half additional minutes. So I'm going to need you to sit down. I'm going to give you some rebuttal time because we're probably going to have questions for you. But when you do sit down, not only am I hoping that your associate will provide you with a site to where you explain to the arbitrators below that this is the new claim issue would present new validity issues, but also where you argued that to us because we don't find that in your brief to us. We don't find any argument in your brief to us that we were prejudiced because this is a new claim and we didn't have an opportunity, therefore, to bring our validity issues. I will. Thank you. So both of those, please. Okay, Mr. Gasper. So Mr. Gasper, he went over by a lot, so I'll give you some leeway if you need it. Thank you, Your Honor. May it please the court, Chris Gasper from Milbank, Tweed, Hadley, and McCloy. I'll get to, Judge Moore, your question about where in the record there's an explanation of prejudice. There simply wasn't. What actually happened is they raised their objection. Their objection was fully briefed by both sides. It was decided under the tribunal's authority, which, Judge Moore, you noted, Section 23-4 of the ICC rules expressly permits the tribunal to determine if a new claim has been injected into an arbitration. The tribunal took on board all of the arguments from both sides, decided that this was not a new claim, and, in fact, the express decision by the whether they got it right or wrong, whether this is a new claim, be subject to that same ridiculously high and deferential standard of review that applies to arbitration agreements, which basically means unless the sky is falling, I don't mess with it. Of course it would. Of course it would, Your Honor. And we don't have to look any further than the New York Convention's expressly stated but extremely narrow examples of when you upset an international arbitration award. What is the precise? I think my sky is falling language might not be exactly right. So what is the precise language that is my review standard for these sorts of issues? Including on the scope of what's generally part of it. Sure. 9 U.S.C. 207 articulates the standard. Quote, the court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the New York Convention. In turn, the New York Convention has seven expressly stated grounds. Now, Dow doesn't go into which of these grounds in particular should operate in its behalf. It simply suggests that there's some amount of discretion that this court and that the district court have in applying these. Now, as to public policy, just as an example, you mentioned sky is falling, Judge Moore. Dow cited not a single appellate case. Not a single appellate case where the public policy exception in the New York Convention was applied to overturn an international arbitration award. There's no examples of this. This is an extraordinarily unusual circumstance. I don't have the New York Convention provisions in front of me. Is one of them particularly apt on the question of the scope of issues decided by the scope of reference? Their argument that the reissue shouldn't have been there. What's the standard of review and how much deference do we give to the tribunal's discussion of Article 23.4, etc.? Or is that, I think maybe the other side suggested that that was de novo, but what's... So this court sits to determine whether or not the New York Convention operated to allow the award to be vacated. And that's the de novo portion that... I guess there's one provision in the New York Convention that says the award deals with or it contains decisions on matters beyond the scope of the submission to arbitration. It does. Does that ring a bell? It does. This is C, and this was the second half of my answer to Judge Taranto's question. You're quite right, Judge Chen. What that so-called difference not contemplated, exception contemplates, is if, for example, the contract here is a commercial contract concerning rights under a particular business deal that involved transfer of genetics and some patent licensing, and instead the tribunal decided that it was going to shift the real estate from one company to another. A completely unrelated issue was decided by the arbitrators. It had completely gone off the tracks and it had no bearing at all on what the parties had agreed that the tribunal was supposed to decide. Okay, but this is an example, and I don't know. Maybe Judge Taranto got the answer to his question out of your example, but I haven't, and I still don't feel like it's an answer to my question either, which started from what is the actual standard of review, and what Judge Taranto wanted in particular is what is the standard of review they suggested de novo on whether something was properly a part of the arbitration or not, and therefore decidable by the arbiters. And so what is the standard, because that's what they're asking us. That's what they're arguing, and so what I need to know from you is what is my standard of reviewing the decision by the arbitrators that this is not a new claim and can be brought into this arbitration. Okay, two steps. First of all, Judge Moore, you sit in ability to review de novo whether the operation of the New York Convention has been applied correctly by the district court. That level of de novo review they state correctly. However, there is no de novo review by this court of what the arbitrators decided when it was given the authority by the parties to decide what was in the scope of the arbitration, and also by authority of the ICC rules 23-4, which said that the tribunal gets to decide whether or not there is a new claim. Do I review that at all, or are you telling me I have no review authority? You don't have review authority over that. The tribunal decided, quote, the reissue does not constitute a new claim and may therefore be considered by the tribunal. This is at Appendix 325. They expressly took in that question. They expressly resolved it. There's nothing more to do with it. And on top of that, there was extensive litigation over all of the invalidity defenses that they said that they were deprived of an opportunity to raise. They raised enablement, indefiniteness, prior art, on down the line, also the obviousness type bill of patenting issue. So it's not as though something was sprung on them. They had no control over whether or not it came in. They litigated all of that, and they lost it. Then they litigated all of the invalidity questions, and they lost them too. All of the work that the tribunal was told by the parties to do, the tribunal did. So observing that the tribunal was doing the issue. Yes, we have all 330 pages. And I read them last night. It took quite a while. It is extensive on all of these points. In the future, you might want to read them before argument a little sooner. I'm sure you re-read them, right? Re-read is what I meant to say. I'm confused. You said unreviewable. So if the arbitration panel just theoretically went really off the rails and started awarding things to the winning party that really was completely unconnected to everything that was debated during the proceeding, you would tell us that that was just the panel's interpretation of the scope of the proceeding and it's unreviewable by us? I really wouldn't, Judge Chen, because the part of the convention that you pointed me to is exactly the right one. Then that part, I think we have to decide. There is something that's reviewable there. Is there not? Yes. So on the margins, there's a decision to be made. Are we talking about the real estate situation that I mentioned, or are we talking about something that is related to the contract, related to the agreement that the parties made when they entered the contract 25 years ago, that anything in connection with this contract would be arbitrated? And this is plainly part of what was contemplated by the parties. The Herx to patent rights that are defined in the contract. What's your view for that and reviewing that question? The standard of review, as you see it here, reviewing the district court's decision to confirm is to know. The district court's ability to look and see if the tribunal had done its job is limited to determining whether or not the award deals with, and I'm now reading right out of the convention, a difference, meaning a dispute, not contemplated by the submission to arbitration. Here, the reissue was plainly contemplated by the submission to arbitration. The patent rights as defined in the contract that the parties agreed to that brought this into arbitration define the patent rights as certain numbers that had issued. I don't think I heard a standard of review from you, but I would assume you would be urging us not to review de novo the arbitration panel's choice to include the reissue in the proceeding. Yes. So what would you be urging other than de novo? Because you're clearly not urging that. Right. I'm doing the best I can, and I'm not trying to evade the question. I'm trying to actually illuminate the way that it's structured under the Federal Arbitration Act and the New York Convention. The Federal Arbitration Act says, shall confirm unless. The New York Convention provides the limited exceptions. The courts that sit to determine whether vacatur or confirmance confirmation of the award, they do that, I suppose, de novo. The fact is that they're applying the statute in this treaty, and this court doesn't have any duty to grant the district court's decision on this any particular deference. Can I ask? I think I once knew something, not about the New York Convention, but about the FAA and labor arbitration, and I think there are some Supreme Court cases that talk about when the question is whether the arbitrator decided an issue properly within the scope of what the agreement provided would be arbitrable. The courts review that, and I want you to finish the sentence saying under what standard of review. Is the scope determination part of what the arbitrator gets lots of discretion about or not? It absolutely is. You look to the party's agreement. Do you have in your head the kind of Supreme Court cases that are only dimly in my head at this moment? Sure. The scope. So we have Mitsubishi Motors saying that the efficacy of the arbitration process requires- What about Oxford v. Sutter? I'm sorry, Judge Moore? What about Oxford v. Sutter? It doesn't articulate a standard any different. The Supreme Court has actually given plenty of examples of the minimal level of review that's available here. On the question of, specifically on the question of whether an issue was arbitrable, not on the question of the right answer to a question that was undisputedly arbitrable. Yes. The Oxford decision, interestingly enough, is what Dow cited to quite a bit in the initial district court proceedings when it was arguing that all of these issues were supposed to go to arbitration. And the view there that Dow took is that not only anything in connection with this agreement, including the patent rights, the breach arguments, the termination arguments, everything had to go to arbitration. I tried to give you Oxford because I thought it helped you. I agree. This is my point, Judge Moore, is that Oxford is exactly right. It does help us. And it's, in fact, what Dow argued should apply, which is that the tribunal gets to decide its own authority as long as it is connected with the issues that are in the agreement. Here's the quote from Oxford that I thought really helped you. Because the parties bargain for the arbitrator's construction of their agreement, an arbitrary decision, even arguably construing or applying the contract, must stand regardless of the court's view. Exactly right. And that's, if not the exact language, very similar to the language that Dow raised with the district court. These are points that have been litigated for sure. So that's exactly the way to look at it. Will you move on? If you don't, if it's okay. If you have more questions, feel free. But will you move on to the interest question? To the interest question. Post-judgment interest. Post-judgment interest. Post-judgment interest, sure. So they suggest that, first of all, somehow the post-judgment interest was not submitted to the tribunal. That's not sustainable. The contract not only says that the parties agreed to dispute, to arbitrate any controversies or disputes, but when the terms of reference were signed, and by the way, I dispute the characterization by Dow, that the terms of reference are what determine the scope of the issues. That's actually not true. The agreement determines the scope of the issues. The agreement says all, excuse me, any controversies or disputes. On top of that, the terms of reference, when signed, said that the arbitrators must decide interests and costs, other relief as the tribunal may deem proper, how much interest on such monetary award is proper and on what basis. And then later, and this is the part that really brings forward the irony of this argument from Dow, later, when the arbitration arguments were coming forward, after the terms of reference had been settled, the parties agreed that full compensation, which is what was required under French law, was an agreeable way to deal with compensation, whether it was going to be going to Dow or going to Bayer, and that if you supported that full compensation, you can achieve it by awarding interest, simple interest, at a rate between 6% and 10%. This is at Appendix 560. I mean, this is expressly given to the tribunal. The tribunal applied the interest rate that the parties agreed. 560 is where, I mean, I can read it into the record, but paragraph 1006 is dispositive on this issue. Interest was given to the arbitrators. This is a French law governed contract. French law required full compensation. It's actually, in this regard, no different from US law. And the arbitrators applied it. So what they came up with was a very simple statement that from the date of the award until full payment, 8% would apply. It's clear here that the tribunal intended post-judgment interest because it says until full payment. It also doesn't say just post-award interest, which is what the Tricon case did. It makes those facts different. But really, more importantly here, you've got an election by the parties. And therefore, the full compensation requirement for remedies under French law applies. And that does, in fact, take into account interest, whether you call it post-award or post-payment. Can you help me understand the distinction between what happened here and what happened in Tricon? Quite a bit, sure. Yes, Tricon also had a post-award interest rate. And then, obviously, the Fifth Circuit said, well, it didn't say enough to displace the strong default rule that once the award is confirmed in district court, that then the federal rate kicks in post-judgment. And so the post-award rate was good for the time from the award to the confirmation by the district court. But then after the district court confirmed the award, then you go back to the federal rate because the award wasn't so crystal clear about specifically overriding the strong default expectation that the federal rate would apply post-judgment. I'm getting a red light, but if it pleases the court, I'll continue. No, I said, no. I'll let you know when to sit down. How about that? Sure. The Fifth Circuit in Tricon, first of all, that's not binding. So here we have no binding law that requires the express exception that the tribunal gave here to 1961 to be overridden. So the tribunal's work was, as I mentioned, by the terms of reference and the arbitration agreement set to determine what the interest was. Tricon is actually worth a pretty close study, Judge Chen, because two interesting things came from that case. One is they said, you can submit to the arbitration panel the determination of post-judgment interest. You can override 1961. And in that case, they found that, in fact, the parties just like here had submitted and agreed, due to the broad agreement language, to submit post-judgment interest as an issue. So that part is exactly the same as our situation. What's different in Tricon, among other things, is that there was an express issue joined and raised with the arbitrators about whether post-judgment interest would apply, and also whether attorney's fees would apply. Two tack-ons to the usual compensatory damages model. And in fact, the tribunal there, as Tricon explained, the Tricon court explained, the tribunal didn't award post-judgment interest. It was asked to award it, and it didn't. So that's one distinction. Another distinction is that it said post-award until paid. Here, we don't have that. We aren't seeing anything from the tribunal to indicate that there was a limitation to simply post-award, as opposed to the entire period until paid. In fact, it says 8%, quote, from the date of the award until full payment, until full payment. Tricon also does something that's very interesting and worth noting. If you follow what the distinction there is between one award saying post-award rate and then another award saying from the date of the award until fully paid, what's the difference between those two? Well, I think that the distinctions on these, I would call sort of technicalities, are not the way that this rises or falls. However, I'll note that if that is the analysis that the Fifth Circuit was engaged in, you can note that in the Tricon case, it said post-award interest until paid. Ours does not say post-award interest until paid. It just says 8% from the date of the award until paid. So there is a distinction in the language. But let's get deeper on it than that, Judge Chen, because what Tricon actually was looking at is the question of whether and under what circumstances 1961 can be overwritten. And Tricon goes through a pretty elaborate explanation of the fact that you can, by agreement, override 1961. You can do that directly or you can do it by submitting to the tribunal the issue of interest. And that's exactly what happened here. Was there the paragraph 1006 and the particular, what is it, subparagraph 24 of paragraph 1008, which are what address this, both use the language of post-award interest. And was there a recognition and therefore discussion of the fact that some post-award interest would be pre-judgment and some would be post-judgment and a facing of that distinction or not? No. Okay. No. Which I think is actually dispositive of the issue in our favor. If it's not carved out expressly, there's no reason to carve it out. And on this, Judge Chen, when we're talking about statutes or student standards of review, we also do have to overlap a very important standard of review on top of this decision that was made by the tribunal and decision by the district court judge. If we accept the notion that the judgment interest, post-judgment interest, is something that the district court can set under the statute, then it's refusal to do that under Rule 59E decision can only be overturned if there's an abuse of discretion. Here there's no law that was overridden or the discretion abused by the district court by having not applied Tricon if it is determined that Tricon should have been applied to the dissatisfaction of buyer. So you've got this abuse of discretion standard on this issue for sure as to what the district court decided. And now I'm sort of the judge's negative. Can I – no, no, I'd like to ask you something. Sure. So the contract right here belonged to – is it buyer or buyer? Depends on which country you're in. Well, aren't we in Germany when we're talking? Yeah, buyer. So buyer, crop, science, AG. The contract right belongs to it and the patent right belongs to NV. Is that right? The contract right – It was originally a Hearst contract, right? Correct, correct. Which then became buyer, AG – not buyer, AG, buyer, crop, science, AG. That's correct. And the patent owner or co-owner is NV because that started out as somebody else. Also correct. And although your patent infringement complaint in the Eastern District of Virginia names both parties, it's not clear to me what AG is doing there. You don't say anything in the complaint about what AG is doing there, even though I think you say in footnote 14 or something of your brief that Hearst had exclusive licensing rights to Lehman's patents. And I'm trying to understand in this context whether the $300-and-something million contract award belongs to one of the buyers, AY, not UY. Sure, yes. And the patent damages belongs to the other of the buyers or somehow everybody at some point started talking about them just as buyer, as though it were a single company. Yeah, Dow tried to talk about them as a single company because – Well, so did the tribunal. And in this regard, there wasn't a reason for distinction. I mean, there was no challenge to the way that the – Well, the context in which I started thinking about it is an issue that was not raised this morning but is an important part of the blue brief, which is the Brulat issue. The breach here – did you agree that the breach here involved conduct that was the practicing of the Lehman's patent? Because those claims on the Lehman's patent, the reissue in particular, seem basically if you use this patent gene, you're infringing the claim while that claim is alive. If I can address that, Your Honor, I think I can do it very quickly. Creating two products, the E3 product and the E3 IR product, was the contract breach. Creating those two products was the contract breach. Dow doesn't even dispute that that was the contract breach, and they don't even dispute that there was a contract breach. They want technical reasons to upset this award, but they did breach, they don't dispute it, and they did infringe, they don't dispute that. The contract issues, including the breach and the remedy for breach, was governed by French law. The tribunal applied French law when assigning the remedy for breach. And here's the most important part. No patent infringement damages at all, not a penny, were awarded for patent infringement in those two cases. I'm not sure that's the most important thing of all. But the conduct that constituted the breach here is conduct that would be an infringement during the life of this patent. So why is enforcing a contract to pay for conduct that is an infringement of the reissue patent until 2023, enforcing a contract to pay for that for the next seven years after not a brulat problem? It's conduct much worse than patent infringement, first of all. It's not a brulat problem because brulat is very narrow, and it says that if you have a patent license, you can't charge for the invention past the life of the patent. Here there was no charge for the patent license, none. They got to infringe for free for those two products. So for those two products that we're looking at, E3 and E3 plus IR, that was the source of the breach. That was the reason for harm. And perhaps if only U.S. law had been elected by the parties and only patent law was what was being discussed, you could assign a remedy under patent law. No dispute about that, Judge Toronto. You're absolutely right. That's not what the parties agreed to. What the parties agreed to is under French law, when there was a contract breach, you would apply the remedies of French law. And the remedies of French law went through and looked at a very expected analysis, which said how harmed was Bayer by virtue of exceeding the license, by virtue of Dow exceeding the license. I don't remember. I know there was no discussion in the briefs, but was there discussion in the arbitration award of what the content of the agreement was over and above the patent rights, what other kinds of rights were benefits were being given by Bayer or Hearst at the time to Luperzal in exchange for the counter promise? Sure. I mean, it didn't get a lot of mention in the arbitration. The one place in the record that I could point you to is Appendix 261. Dow's predecessor received the PATG in itself, the phosinate-resistant plants, licenses to the patents here that were deemed infringed, licenses to other patents, licenses to patents outside the United States. And at bottom, really what happened here is that Bayer gave the PATG and the genetics and the material that was used by Dow to replicate all the genetics of the PATG into the super product that it has right now, and they've done that very, very successfully. They've got multiple tens of billions of dollars of product there that is available to them. They haven't stopped using it, and now they suggest that on technicalities, we're entitled to not even the award for breach that the tribunal provides. Okay, Mr. Gasper, I think now is the time. Thank you for your patience. Yes, Mr. Lender, I'm going to give you like four minutes of rebuttal. That will come close to evening it out. We'll see how it goes. Thank you, Hunter. First, to answer your question from before, in the briefing, if you look at our reply brief at page 27. Well, you know, reply brief? Well, this is where we raise the specific issue of the prejudice of not being able to, on the validity issue that you raised. Where did you raise it? In front of the tribunal, which I think is maybe the most important. And now I appreciate the issue here because the appendix only includes certain pages of the memorial submission. And so the appendix stopped at appendix 350, but the submission goes to appendix 3052. So we'll have to submit that to the court. But in appendix 3052, in that submission, we actually raised the issue. Most important, this is a new patent with different invalidity implications. So it was absolutely raised before the tribunal. So we'll have to submit this, and we apologize that the appendix stopped at page 350 and didn't continue on to 3052. Second issue, terms of reference clearly delimits the scope of the arbitration. That's based on Article 23. And I know there's a lot of going around, but I don't think there's any question this is a de novo standard for you to review. And, in fact, we raised this in our opening brief, and Baird didn't dispute it in their opposition brief. Why is it de novo if under cases like Oxford, which Judge Moore quoted, and this is my general recollection, so you will know better than I at the moment, that the question of the scope of issues that are covered by an arbitration agreement is itself initially for the arbitrator, then subject to something more deferential than de novo review. Why is this not like that? Remember, there's two contracts here, right? There's the agreement to arbitrate, and then there's the negotiated terms of reference. So these are two completely different contracts. So the question of what issues go to arbitration or whether this is an arbitrable dispute, that's clearly within the scope of the arbitration clause. But then in an international arbitration, you negotiate very specific terms of reference. And even in Oxford Health, the language says that if the arbitrator, this is a quote from Oxford Health, if the arbitrator acts outside the scope of his contractually authorized authority, issuing an award that simply reflects. Right, but that just gets to the result of the conclusion that somebody got it wrong. The question is, you know, how finely do we scrutinize whether the arbitrator got wrong the decision of scope? And I guess it feels a little strange to me to think that if the initial arbitration agreement is subject to a fairly robust discretionary arbitrator's interpretation, that once you get into the arbitration process itself, that the arbitrator's decisions become more subjected to judicial review, like the interpretation of an agreement once the arbitration, like the terms of reference. That seems upside down. The issue is, is this patent dispute arbitrable? That goes to the arbitrators. But in a convention award, the reason why you negotiate the terms of reference, why it's a big event, why it took almost a year to negotiate here, is because those are the specific issues that the parties are agreeing that the arbitrators get to decide. That is the terms of reference that undisputedly does not include the reissue patent and undisputedly was never amended. And as I said, we cited the restatement that makes it clear that this is a de novo issue for the court's jurisdiction to decide whether an issue is within the scope of arbitration. The restatement? The restatement of international arbitration. The people in Philadelphia wrote a document, and that's binding authority on us? Well, it's not binding on you, but again, we raised that this was a de novo standard of review, not disputed by Bayer. I didn't even hear them dispute it when they got up here. It wasn't disputed in their brief at all. I do want to just take one minute and talk about the Kimbell issue that you raised, if I could, because there is no question that the sole breach here was sublicensing PAT covered by a U.S. patent, and that once that patent expired in 2023, PAT was free for anyone to use, and yet they awarded $130-plus million after the U.S. patents expired. I'd like you to touch upon the post-judgment interest question. Yes, thank you. Your Honor, we think the Tricon applies, and the distinction was not so distinct, let's just say. But that's not Fourth Circuit law. We don't know exactly what the Fourth Circuit would say about this. And just to be clear, I mean, given the standard of deference that we're supposed to give to arbitration decisions, I mean, it's not like every circuit has addressed this question and all come out the same way, therefore we should assume the Fourth Circuit would too. Given the level of deference, even though Tricon clearly on all fours favors you, but given the level of deference that we owe, how do we get there? Because this, Your Honor, this is not an arbitration issue. This is actually a review of what the district court did. We're not challenging the award of post-award interest, which is what the arbitrator said. Whether I agree with it or not, we're not disputing that, that the period of time between the issuance of the award and the judgment by the district court is 8%. So don't we have to interpret and try to understand what the panel, the arbitration panel, intended when it said a post-award rate or a rate upon the date of the award until paid? We have to figure out what that means and what they intended, and did they, in fact, intend to displace the federal rate? And that's why, obviously, we cite cases like Tricon and Fidelity and Goldman, which was at least from the Fourth Circuit, where those courts have repeatedly said that that kind of language is, in fact, it's what the words say in Tricon, that that boilerplate does not demonstrate that the panel intended to circumvent the merger rule. It's exactly what they were doing in Tricon. They were interpreting what the arbitrator said. In fact, they said the opposite. They said because it wasn't clear that that's what the arbitrators were doing, that you can't then assume that they intended to displace the statutory rate after the arbitration award is converted to a judgment by the district court. That's why we think Tricon is exactly on the square force. Okay. Thank you, Mr. Linder. I thank both counsel. The case is taken under submission.